**In re AOV INDUSTRIES, et al.**

Civ. A. Nos. 83–1901, 83–1978 and 83–2085.

United States District Court, District of Columbia.

July 26, 1983.

Paul L. Friedman and Anne D. Smith, of White & Case, Washington, D.C., and Charles A. Docter, of Docter, Docter & Salus, Kensington, Md., for debtor.

W. Forbes Ramsay and Peter K. Stackhouse, of Tolbert, Smith, Fitzgerald & Ramsay, Arlington, Va., and Louis Scarcella, of Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for Hawley Fuel.

Edward L. Genn, of Brown, Genn, Brown & Karp, Washington, D.C., for Hubert Bruce.

## OPINION

CHARLES R. RICHEY, District Judge.

This case is before the Court for a determination whether a plan of reorganization

for the debtor, AOV Industries and its related entities, was properly confirmed by Bankruptcy Judge Roger Whelan on June 30, 1983. The case was originally brought before the Court upon certification by Judge Whelan that circumstances require review by this Court. Certification was made pursuant to section (e)(2)(A)(ii) of the Emergency Bankruptcy Rule passed by this District on December 22, 1982. The rule provides that, in the event of certification, this Court shall review the matter and enter judgment "as soon as possible." Four days after certification, this Court held hearings and heard argument from representatives of the debtor in support of the reorganization plan and from representatives of two creditors of the debtor, Hawley Fuel Coal, Inc. and Hubert R. Bruce, in opposition to the plan. Upon conclusion of the hearing, the Court ordered the parties to submit briefs on the issues they wished the Court to review and to designate the portions of the record below relevant thereto. Subsequently, formal appeals filed by Hawley and Bruce were also transmitted to the Court. Upon careful consideration of the entire record in these actions, the Court has decided to approve the plan of reorganization, and accordingly to affirm Judge Whelan's order of confirmation. The reasoning underlying this conclusion shall be elaborated herein.

## I. THE COURT HAS JURISDICTION TO REVIEW THIS MATTER BOTH UNDER THE EMERGENCY RULE AND AS AN APPELLATE TRIBUNAL.

Throughout the proceedings before the Bankruptcy Court, creditor Hubert R. Bruce repeatedly challenged the jurisdiction of that Court to adjudicate this case.[1] It was in part because of these challenges to jurisdiction that the debtor sought certification of the case to this Court. No sooner did Mr. Bruce obtain a hearing in an Article III Court, however, than he began to challenge this Court's jurisdiction as well. Mr. Bruce claims that he has a "statutory" right to appeal to this Court from Judge Whelan's order of confirmation, and that if this Court rules upon this case pursuant to the certification procedure of the Emergency Rule, his right of appeal will be cut off.

The difficulty with this argument is that the present action offers Mr. Bruce the very rights which he claims are being cut off. He has been given a chance to raise and brief all of the issues which he would be entitled to raise on appeal and also to designate the portions of the record upon which he bases his challenge. Indeed, because of lack of clarity in the standard of review called for under the Emergency Rule (to be discussed further in Part II), this Court must apply *closer* scrutiny to the issues he raises than it would in a regular appeal.

Moreover, in the interest of judicial efficiency, Mr. Bruce's formal appeals of Judge Whelan's order of confirmation has been assigned for review to this Court (Civil Action Nos. 83–1978 and 83–2085).[2] Thus, this Court will have to rule upon the issues he raises sooner or·later, and it sees no reason not to do so now. Although it is true that Bankruptcy Rules 806–08 might have provided Mr. Bruce a somewhat longer time period to brief his complaints than was allowed for by this Court's order, Bankruptcy Rule 814 authorizes this Court to suspend these terms "in the interest of expediting decision or for other good cause." It is, in

---

**1.** The Court finds these contentions by Mr. Bruce to be totally without merit. The Bankruptcy Court acted directly pursuant to the terms of the Emergency Rule. The validity of identical rules in other Courts has been repeatedly confirmed by the Courts of Appeal. *See White Motor Corp. v. Citibank, N.A.,* 704 F.2d 254 (6th Cir.1983); *First National Bank of Tekamah v. Hansen,* 702 F.2d 728 (5th Cir. 1983); *Braniff Airways, Inc. v. Civil Aeronautics Board,* 700 F.2d 214 (5th Cir.1983). More-over, the very purpose of this action pursuant to certification is to cure any defects that may theoretically have existed in the jurisdiction of the Bankruptcy Court.

**2.** The appeal filed by Hawley Fuel has also been assigned to this Court (Civil Action No. 83–2085). Unlike Bruce, though, Hawley has not objected to this Court's exercise of jurisdiction over the matter.

sum, in keeping with judicial economy and efficiency for this Court to exercise jurisdiction over this matter both under the Emergency Rule and as an appellate tribunal. In either role, jurisdiction is plainly proper in this Court under the terms of the Emergency Rule.

## II. THE STANDARD OF REVIEW THIS COURT WILL APPLY IS WHETHER CONFIRMATION IS SUPPORTED BY SUBSTANTIAL EVIDENCE.

■ Another issue raised by Mr. Bruce, and also by the debtor, concerns the proper standard of review to be applied in this case.[3] Section (e)(2)(B) of the Emergency Rule provides that

in conducting review, the district judge may hold a hearing and may receive such evidence as appropriate and may accept, reject, or modify, in whole or in part, the order or judgment of the bankruptcy judge.

As the debtor points out, this language gives the Court discretion to apply whatever standard of review it considers appropriate in the circumstances. It could, on the one hand, accord great deference to the findings and conclusions of the Bankruptcy Judge, in light of the extensive proceedings he conducted. It could also, if it chose, conduct a full *de novo* hearing replete with witnesses and documentary evidence.

In the Court's view, an approach somewhere between these two extremes is eminently more appropriate. As the Supreme Court stated in *Chandler v. Roudebush*, 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976), "in the absence of specific statutory authorization a *de novo* review is generally not to be presumed." Here, there is no such specific authorization. Similarly, it has been held that, in the aftermath of the Supreme Court's decision in *Northern Pipeline Construction Co. v. Marathon Pipeline*, —— U.S. ——, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), a "clearly erroneous" standard

should not be applied where the proceeding below was not conducted by an Article III judge. See *1616 Reminc Limited Partnership v. Atchison & Keller Co.*, 704 F.2d 1313 (4th Cir.1983). The standard of review that this Court considers *is* appropriate to this situation is the "substantial evidence" test, which our Court of Appeals explicitly sanctioned in the recent case of *Kalaris v. Donovan*, 697 F.2d 376 (D.C.Cir.), *cert. denied*, —— U.S. ——, 103 S.Ct. 3088, 77 L.Ed.2d 1349 (1983). Although the standard suggested in *Kalaris* may have been a relatively high standard because, in that case, the findings below were made by an administrative agency rather than an Article I judge, that standard is appropriate here because of the repeated challenges made to Judge Whelan's jurisdiction in all of the proceedings before him.[4]

Accordingly, the Court shall review Judge Whelan's findings of fact to determine whether they are supported by substantial evidence. It shall also, of course, review his conclusions of law to determine whether they are consonant with the law as this Court views it.

## III. HAWLEY FUEL IS NOT RECEIVING UNEQUAL TREATMENT UNDER THE PLAN.

Under the terms of the debtor's plan of reorganization, creditors and shareholders are divided into eight classes, one of which, class 5, consists primarily of general unsecured creditors, including Hawley Fuel. Payments to class 5 creditors are to be made pursuant to a somewhat novel arrangement, under which funds are to come from two sources. First, the debtor will contribute approximately $800,000, to be divided *pro rata* among all allowed class 5 claims. Second, two creditors of the debtor, Steag Handel GmbH and H.C. Sleigh Netherlands, will contribute letters of credit in a total amount of almost $3 million, the pro-

---

3. This question was not raised by Hawley Fuel because, according to Hawley, it seeks review of only legal determinations made by Judge Whelan, which this Court could accept or reject regardless of what standard of review it used.

4. Such a standard is clearly adequate whether the proceedings before the Bankruptcy Court are considered to have been "core" proceedings or "related" proceedings, as those terms are defined in the Emergency Rule.

ceeds of which will be payable *pro rata* to class 5 members who agree to release Steag and Sleigh of all claims arising out of transactions with the debtor. In voting on the plan, each creditor of the debtor was given a choice whether to accept or reject the plan and a separate choice whether or not to release Steag and Sleigh.

Hawley Fuel is one of the few creditors that rejected the plan and also one of the few that elected not to release Steag and Sleigh. As a result of its vote, Hawley is to receive a distribution only from the funds provided by the debtor, and not from the funds provided by Steag and Sleigh. All of the other members of class 5 with claims against Steag and Sleigh voted to accept the plan and to tender releases, and thus, will receive funds from both sources.

██ Hawley alleges that because it will not receive the distribution of funds from Steag and Sleigh, as will the other members of its class, it is receiving unequal treatment under the plan.[5] It points to 11 U.S.C. § 1123(a)(4), which provides that a plan must provide the same treatment to each claim or interest with a class unless a particular claimholder agrees to less favorable treatment. It also alleges that the division between the two sources of funds to be distributed to class members is artificial, and, that in fact funds will ultimately be paid from only one source, the disbursing agent for the debtor. Third, Hawley claims that if it is not to receive the same treatment as the other members of its class, it should be put in a class by itself.

The easy answer to Hawley's first charge is that it *is* receiving the same treatment as the other members of its class. It is given the option, just like all the other members of the class, whether to receive a distribution from both the debtor and Steag and Sleigh or to receive a distribution from only the debtor while retaining its right to maintain an action against Steag. Hawley responds to this somewhat obvious answer by claiming that it is the only creditor that would have to give up a *bona fide* claim against Steag in order to receive funds from Steag and Sleigh.[6] The difficulty with this argument is that it is based on a factual predicate upon which Hawley chose to present no evidence below. Hawley repeatedly waived its right to present evidence before Judge Whelan. *See* Transcript of June 27, 1983, at 43, 57, 102, 103, 117. Presumably, its claim of uniqueness is based upon a telex from Steag which allegedly created a guarantee on the debt owed to Hawley. However, evidence that is *in* the record would negate any assertion that Hawley was the only creditor to receive such a telex. Transcript of June 28, 1983, at 137–38. As the debtor points out, Hawley should know from its participation on the Alla-Ohio Creditors' Committee that similar telexes were sent by Steag to a *large* number of the debtor's creditors at about the same time.

In response to Hawley's argument that the sources of the funds to be distributed to class 5 members are not truly separate, the debtor points to the very terms of the reorganization plan. Under the plan, the funds to be disbursed are truly divided into two parts, one of which will consist of cash and lien from the debtor, the other of which will consist of letters of credit issued for the accounts of Steag and Sleigh. The plan specifically provides that the disbursing agent for the plan shall not draw on the letters of credit except for the purpose of paying a releasing creditor. *See* Plan Articles VIII(A), IX(A). Thus, contrary to Hawley's contentions, all payments under the plan are *not* to come solely from property of the debtor.

---

5. In his reply brief, Bruce claims that he takes the same position with respect to inequality as Hawley, although he no where explains in what respect the plan is unequal to him. Accordingly, the Court will not address his claim of inequality, except to say that it takes the same position on inequality as to him as toward Hawley.

6. Hawley has a suit pending against Steag in the United States District Court for the Southern District of New York that is presently set for trial in January 1984. *See* n. 7, p. 1010 *infra,* and accompanying text.

Hawley's third argument is that it should be placed in a class by itself. Again, this argument is based on the unproved factual predicate that Hawley's claim is unique. Hawley also cites the case of *Barnes v. Whelan,* 689 F.2d 193 (D.C.Cir.1982), in which our Court of Appeals held that it is permissible for a debtor to classify creditors according to the absence or presence of a guarantor. However, *Barnes* does not hold that a debtor *must* classify claims on that basis; it holds only that á debtor *may* thus clarify. Moreover, *Barnes* reaffirms the bedrock principle that the debtor may group together any claims that are "substantially similar," which includes all claims that have "equal legal rights to the debtor's estate." *Id.* at 201. Hawley cannot show that it is not "substantially similar" to the other claims in class 5.

In sum, the Court held that Hawley is *not* receiving unequal treatment under the plan. Based upon its election, it will receive its *pro rata* share of the funds provided for class 5 by the debtor. It is also perfectly free to pursue its claim against Steag in the Southern District of New York.[7] If it chooses later to release that claim, it can participate in the share of the letters of credit provided by Steag and Sleigh as well.

## IV. THE PLAN DOES NOT GRANT A "DISCHARGE" TO STEAG AND SLEIGH.

■ Both Hawley and Bruce argue that because of the arrangement in the plan for the provision of releases to Steag and Sleigh, the plan invalidly grants a "discharge" to those entities. Citing the case of *First National Bank of Herkimer v. Poland Union,* 109 F.2d 54 (2d Cir.), cert. denied 309 U.S. 682, 60 S.Ct. 723, 84 L.Ed. 1026 (1940), they argue that such a discharge for third parties is not a proper part of a plan of reorganization. They further argue that a Bankruptcy Court is without power to enforce a release of third parties, and Bruce argues that releases are beyond the jurisdiction of the Bankruptcy Court

since they constitute "related" matters, which the Supreme Court has held must be acted upon by an Article III tribunal.

In response to these arguments, the debtor argues that there has been no "discharge" of Steag or Sleigh as that term is defined under the Bankruptcy Code, 11 U.S.C. § 524, and, that therefore, the principle set forth in *Poland Union* is inapposite to the present case. Rather than granting a discharge, the plan provides that any creditor may individually and *voluntarily* release Steag and Sleigh of any alleged liability in return for the extremely valuable consideration tendered by Steag and Sleigh. Hawley and Bruce are completely free to pursue any rights they may have against these entities. Release of these rights was not even tied to acceptance or rejection of the plan, although the debtors argue that it might legally have been.

■ As to the enforcement of these releases, Hawley and Bruce raise a somewhat more troublesome objection. If one thing is clear from the Supreme Court's decision in *Northern Pipeline,* it is that state law claims cannot constitutionally be adjudicated by the Bankruptcy Court. Judge Whelan's order of confirmation, however, provides that "all releases tendered by individual creditors in accordance with the Amended Plan are hereby found and declared to be fully enforceable in accordance with their terms, any provision of applicable non-bankruptcy law to the contrary notwithstanding." This declaration was probably beyond Judge Whelan's power. However, for two reasons, this defect is in no way fatal to the reorganization plan. First of all, because the releases have been voluntarily given by the individual creditors, this declaration really is unnecessary to the proper consummation of the plan. Second, even if it is beyond the power of a Bankruptcy Judge to enforce such releases, it is not beyond the power of this Article III Court. This Court would enforce those releases because it believes that the plan is in

---

7. The same is true of Hubert Bruce. Bruce is in no way estopped by the plan from litigating in full the disputes he has with the debtor.

the "best interests of the creditors." (*See* section VI *infra*.)

## V. THE PLAN HAS BEEN PROPOSED IN GOOD FAITH.

One of the critical requirements for confirmation of a reorganization plan is that the plan be proposed in good faith and not by any means forbidden by law. 11 U.S.C. § 1129(a)(3). Both Hawley and Bruce offer arguments that the plan here has not been proposed in good faith. Hawley argues that the plan is designed to deprive it of a meaningful vote on the plan. Hawley also contends that the plan was designed by Steag and Sleigh in order to secure releases of liability for themselves and to provide Steag and Sleigh with substantial interests in the debtor. Under the plan, Sleigh will become the 100% shareholder of the debtor, while Steag will obtain a $2.6 million security interest in the debtor's assets.

In response to these contentions, the debtor points out that the classification of Hawley's claim was entirely proper, a proposition with which this Court has already agreed above, and, that therefore, Hawley was not deprived of a meaningful vote on the plan. The debtor also points out that Steag and Sleigh are making enormous contributions to the plan in return for the interests they will receive. In addition to almost $3 million in letters of credit, Steag and Sleigh are contributing cash totalling $1.6 million to cover administrative expenses and a settlement with Equibank, a secured creditor. They are putting up guarantees totalling $2 million to cover the operating expenses of a critical port facility, and Steag has agreed to provide a purchaser for a one-half interest in the port facility or, in the alternate, provide $3.15 million itself. Finally, Steag and Sleigh are withdrawing claims totalling some $51.8 million. In the Court's view, this is more than an adequate return for the interest in the debtor which these entities are to receive, and thus demonstrates no bad faith on their part.

Turning to Bruce's allegations, the first allegation is that the debtor has brought suit against Bruce in bad faith. However,

an assessment of the debtor's charges in that law suit suggest that the bad faith is on the part of Bruce rather than the part of the debtor. The suit charges that, in 1980, Bruce redeemed a 20% stock interest in the debtor for $1.2 million at a time when 20% of the net value of the debtor was not worth anything near $1.2 million. It further charges that Bruce subsequently sold certain coal-related assets to the debtor at a price far exceeding their fair market value. To be sure, these charges remain to be proved by the debtor, but the fact that the debtor has sought to assert them certainly does not reflect bad faith on its part. Indeed, even if it did Bruce is in no way estopped from raising the issue, as appropriate, in the course of his defense of that suit.

The other allegations made by Bruce concerning the debtor's good faith relate to conflicts of interest. As debtor's counsel has ably stated, "[Mr. Bruce's counsel] sees conflicts of interest everywhere. He sees conflicts of interest in the Alla-Ohio Creditors Committee. He sees conflicts between Sleigh and the debtor. He sees conflicts of interest in the work done by White & Case. . . . It is like people who see communists under their beds." Transcript of June 28, 1983, at 26–27, 33. As far this Court can decipher, the conflicts of interest alleged by Bruce stem from the following: (1) prior representation by debtor's counsel, White & Case, of one of the debtor's principal creditors, H.C. Sleigh, (2) a guarantee by Sleigh to pay the fees of White & Case that are not recoverable under the plan, and (3) communications made to Judge Whelan concerning Bruce prior to Bruce's being represented in the case.

As the Court already indicated at oral argument, it sees no merit whatsoever in Bruce's allegations that Judge Whelan should have recused himself under 28 U.S.C. § 455. Having read the cases cited by Bruce, the Court can only reiterate that position. Even if Judge Whelan did hear allegations concerning Bruce prior to Bruce's being represented in the case (and Bruce has made no specific showing that he

did), that would not create a conflict of interest requiring recusal by the Judge.[8]

With respect to the prior representation of Sleigh by White & Case, the Court's attention is directed to 11 U.S.C. § 327(c), which provides that "a person is not disqualified for employment [by the debtor] solely because of such person's employment by or representation of a creditor, but may not, while employed by the [debtor] represent, in connection with the case, a creditor." White & Case maintains that it has not represented Sleigh in any manner since it became counsel to the debtor, and Bruce has presented no evidence to the contrary. Moreover, as was true during the course of the preparation of the plan, all aspects of this representation have been fully disclosed.[9]

With respect to Sleigh's guarantee of White & Case's fee, this was also disclosed and litigated long before the present plan came to fruition. At the time it was originally raised, Judge Whelan ruled that there could be no payment under the guarantee without express approval of the Bankruptcy Court at the time of the final application for fees. If, at the time of that fee application, Bruce can present evidence that White & Case has in fact represented Sleigh in the course of preparing the reorganization plan, then White & Case *may,* according to *In re 765 Associates,* 14 B.R. 449 (Bkrtcy.D.Hawaii 1981), and the other cases cited by Bruce, be disqualified then. Until that time, however, there can be no payment under the guarantee and thus there is no conflict of interest problem.[10]

## VI. THE PLAN IS IN THE BEST INTEREST OF THE CREDITORS.

■ In the proceedings below, both Hawley and Bruce raised doubts about whether the plan was in the best interest of the creditors. Under the Bankruptcy Code, the requirement that a plan be in the best interest of the creditors is incorporated into the requirement of 11 U.S.C. § 1129(a)(7) that each holder of a claim or interest in the debtor receive not less under the plan than it would receive if the debtor were to be liquidated. In order to assess whether this requirement was met, Judge Whelan had to make factual findings as to the proper valuation of the debtor's assets. Because Hawley waived its right to present any factual evidence before Judge Whelan, it is estopped from challenging his factual determination now. The same is not true, however, with respect to Bruce, and thus the Court must determine whether Judge Whelan's findings as to valuation were supported by substantial evidence.

■ Those findings were based on the testimony of four witnesses and on exhibits introduced by the debtor in the course of the hearings held on confirmation. Specifically, Peter Gilcrist, the President of the debtor and a person with over 15 years of experience in the coal industry, testified as to both the liquidation value and the "going concern" value of the debtors' assets. His testimony was supported by that of the counsel to the Alla-Ohio Creditors' Committee, a committee made up of coal traders, coal producers, and railroads, that had itself carefully evaluated the disposition of the debtors' assets and especially the value of the debtors' claims against Steag Handel. Judge Whelan also heard testimony from John Caffrey, a mining engineer with more than 30 years of experience in the coal industry, concerning the liquidation values he assigned to most of the debtor's coal facilities after personal inspection, and from David Matthews, a real estate appraiser, concerning the liquidation values he as-

---

**8.** Further, no motion of recusal was filed against Judge Whalen in the proceedings below.

**9.** These unfounded accusations made against White & Case, one of the nation's most honorable, ethical and competent law firms, are clearly raised as a smokescreen.

**10.** One other conflict of interest alleged by Bruce concerns the prior employment by Sleigh of the debtor's president, Peter Gilchrist. While this was raised by Bruce primarily to impeach the credibility of Gilchrist's valuation of the debtor, it should be noted that, as is true for White & Case, Gilchrist's prior employment by a creditor does not disqualify him from employment by the debtor under 11 U.S.C. § 327.

signed to the terminal and dock facilities of the debtor.

By contrast, Judge Whelan heard no witnesses on behalf of Bruce. He heard no expert opinion to support Bruce's claim that the debtor's assets should be valued at a figure substantially higher than that supported by the debtor's experts. Bruce did seek to introduce several documents containing older, earlier valuations of the debtor's assets. His counsel sought to impeach the credibility of the debtor's witnesses by demonstrating that they had no knowledge of one of these prior valuations, contained in what he called a key telex. He also challenged the testimony of Peter Gilchrist on the ground that Gilchrist was a former employee of Sleigh, a principal shareholder of the debtor. And he challenged the debtor's failure to include in its assets the value of claims it had against Steag and Sleigh.

Taking all of this evidence into account, Judge Whelan found that the plan *was* in the best interest of the creditors. He specifically found Mr. Gilchrist to be a very credible witness as to liquidation and going concern valuations. Included in those valuations was the determination that the claims against Steag were probably unrecoverable, and the determination that a liquidation of debtor's assets probably would not produce enough to pay even the priority creditors of the debtor, let alone unsecured creditors or shareholders.

Based on this Court's own review of the evidence presented, the Court concludes that Judge Whelan's findings as to valuation are supported by substantial evidence. The Court is unable to comprehend how later outdated valuations of the debtor's assets could possibly be considered to outweigh the strong testimonial evidence of valuation offered by the debtor. What was clearly lacking in Bruce's presentation was countervailing testimonial evidence by an expert that the debtor's assets should be valued higher. Although Bruce raises a good point about the debtor's failure to include in its figures any valuation for claims against Steag, the weight of the evidence presented indeed supports the conclusion that those claims were valueless. Thus, like Judge Whelan, this Court must also conclude that the plan is in the best interest of the creditors.

## VII. THE BANKRUPTCY PROCEEDINGS WERE PROCEDURALLY FAIR.

■ Repeated almost as often as his claims of conflict of interest are Bruce's claims that the confirmation proceedings were procedurally unfair. Bruce claims that he was given little time for discovery, that the interrogatories he propounded were not answered, that the documents he requested were not produced, and that the one deposition he was allowed occurred on the eve of the confirmation hearings and was of a witness who did not know certain critical information. He further complains that several key witnesses were not produced at the confirmation hearings, and that those who were produced did not have their records with them in court. These defects, he alleges, are so great as to amount to a denial of procedural process.

In response, the debtor contends that the difficulties Bruce encountered were the products of his own delay and lack of preparation. Bruce was a member of the AOV Creditors Committee for at least a year prior to confirmation of the plan and as such had not only the opportunity but also the duty, as a representative of other creditors, to seek all information relevant to the debtor's reorganization. He also had an opportunity to engage in formal discovery with the debtor at least as early as February of this year, when the debtor filed suit against him. Third, since May 31, 1983, the debtor has made available to all creditors the pertinent information on which the plan of reorganization was based, including the valuations testified to in court. Nonetheless, Bruce waited until less than three weeks before the confirmation hearings before commencing discovery.

At that point, because Bruce was dissatisfied with the extent of the documents already made available, the debtor agreed to make available to him *all* of its non-privileged documents, whether related to the confirmation proceedings or not. The debt-

or also agreed to arrange the deposition requested by Bruce on the day *before* he wanted it, and at that time produced for deposition the *President* of the debtor, Mr. Gilchrist. According to the debtor, the deposition lasted for over five hours, at the conclusion of which it was counsel for Mr. Bruce who decided to call the proceeding to a halt. Not until the day before the confirmation hearings did Bruce indicate that he wanted any further discovery, at which point debtor's counsel did whatever it could to provide the requested information.

This sequence of events hardly suggests any denial of due process to Bruce. The cases he cites in support of his procedural complaints stand merely for the elementary proposition that notice and an opportunity to be heard are essential to due process. *See, e.g., Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). As to the witnesses Bruce claims were not produced, he offers absolutely no explanation why he did not produce them himself. His failure to even attempt to produce these or any other witnesses stands as evidence not of any defect in the confirmation proceedings, but rather of the fact that Bruce sat on his hands for 18 months while others strove to negotiate the plan of reorganization that he now seeks to scuttle at the eleventh hour.

Bruce's allegations of procedural unfairness in the earlier proceedings surrounding the debtor's disclosure statement are similarly meritless. Bruce alleges that the disclosure statement, like the witnesses the debtor presented in court, concealed known prior valuations of the debtor's assets and failed to take into account the value of substantial legal claims actionable by the debtor. He also alleges that he had virtually no opportunity for discovery prior to the hearing Judge Whelan held on the disclosure statement nor a true opportunity to be heard at the hearing, which he says was marred by last minute additions to the statement under review.

While it appears to the Court that the hearing on the disclosure statement was conducted by Judge Whelan somewhat hurriedly and that the time for creditors to review and object to the statement was short, the time was not so short as to deprive Mr. Bruce of due process of law. The discovery which Bruce claims he so sorely needed could have been conducted before *and* after the disclosure statement was reviewed, although Bruce waited until virtually the eleventh hour to conduct any discovery. Bruce's oral presentation at the disclosure hearing was not limited to ten minutes, as Judge Whelan threatened, and was also supplemented by a voluminous brief, which Judge Whelan had already read at the time of the hearing. As to the information allegedly concealed in the disclosure statement, the importance of this information was never established, not even at the 3-day confirmation hearing discussed in detail above.

In sum, the Court concludes that all of Mr. Bruce's objections are without merit, and that the proceedings before the Bankruptcy Court were procedurally fair.

## VIII. BRUCE LACKS STANDING TO RAISE TWO ADDITIONAL ISSUES.

■ Finally, Mr. Bruce raises two additional substantive objections that he lacks standing to raise, and to which the Court need therefore give only passing reference. The first is that the plan improperly grants junior creditors priority over senior creditors by providing that Sleigh will receive common stock of the reorganized debtor. Bruce lacks standing to raise this argument because he is a creditor, not a shareholder of the debtor. Because all the creditor classes of the debtor accepted the plan, the Court need not apply any test of priority to them. *See* 11 U.S.C. § 1129(b). Moreover, even if Bruce did have standing to raise the claim as a shareholder of the debtor (as he might if the debtor were to prevail in its suit against him), his claim would lack merit nonetheless. This is because an equity holder, like Sleigh, *can* receive stock in a corporation undergoing reorganization so long as it makes a fresh capital contribution that is reasonably equivalent in value to the

interest received. *See Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106, 121, 60 S.Ct. 1, 10, 84 L.Ed. 110 (1939); *In re Landau Boat Co.,* 13 B.R. 788 (Bkrtcy.W.D.Mo., 1981); *In re Marston Enterprises, Inc.* 13 B.R. 514 (Bkrtcy.E.D.N.Y.1981).

Bruce's other objection is that the plan of reorganization is not "feasible," as required by 11 U.S.C. § 1129(a)(1). Since creditors like Bruce will not have any equity interest in the reorganized debtor, it does not appear that Bruce has any interest in the feasibility of the plan. In any event, though, it is hard to imagine greater pains the debtor could have taken to ensure the feasibility of the plan. The plan is premised on the continued operations of certain facilities of the debtor. All but one of these facilities will either prosper or be liquidated by 1986. As to the one remaining facility, Steag will guarantee the operating costs of that facility for the first year, and Sleigh will guarantee the rent for it for five years, thus assuring the feasibility of the plan.

## CONCLUSION

In sum, the Court holds that the debtor's plan of reorganization should and must be confirmed. The Court has carefully evaluated the evidence presented before Judge Whelan and concludes that his findings of fact were supported by substantial evidence. The Court has also considered the legal arguments of the parties, fully briefed both here and below, and concludes that Judge Whelan's legal conclusions are also correct. In the Court's view, the legal position of Hawley Fuel is without merit, and the legal and factual positions of Hubert Bruce constitute a barely-concealed effort to obstruct confirmation of the plan.

An order in accordance with the foregoing shall be issued of even date herewith.