Opinion for the Court filed by Circuit Judge MIKVA.
Opinion concurring in part and dissenting in part filed by Circuit Judge STARR.
*1006 MIKVA, Circuit Judge:
This is the second in a series of appeals brought to this court involving the bankruptcy of AOY Industries. In our original decision, we dismissed the challenges of appellant Hubert Bruce to the AOV Reorganization Plan (“the Plan”), finding that his claims were moot because the Plan had been substantially consummated. In re AOV Industries, 792 F.2d 1140 (D.C.Cir.1986) (“AOV I”). Our holding made it unnecessary to consider appellant’s allegations of a conflict of interest; we specifically advised the parties, however, that this issue would be squarely presented here.
This second appeal concerns a challenge to the fee award granted by the bankruptcy court to the law firm of White & Case (“W & C” or “the law firm”), counsel in bankruptcy to AOV. The third appeal, challenging a different fee award, is resolved in a companion opinion released today. In re AOV Industries, 798 F.2d 491 (D.C.Cir., 1986).
The question before us is whether the bankruptcy court’s award of $1.27 million in fees to White & Case, and the district court’s affirmance of that award, were proper. Bruce claims that the award should be eliminated or reduced because the law firm had a conflict of interest in representing AOV, and that it thus could not carry out its duty of zealous representation. While we are not prepared to conclude that W & C’s fees must be reduced, we hold that the factual findings made in support of the award were clearly erroneous. There is strong evidence that while it was representing AOV, W & C also was performing work for one of AOV’s major creditors. Because it is difficult to tell from the record how significant the overlap was, or whether the work was done “in connection with” the bankruptcy proceedings as prohibited by statute, we vacate that part of the district court’s decision that relates to the W & C fee award, and remand with instructions to reconsider the evidence of a conflict of interest.
I.
The underlying facts of this case are presented in AOV I. Here we only discuss the events directly relevant to this appeal.
AOV Industries was established in 1976 by Hubert Bruce and others for the purpose of selling coal in this country and overseas. Although the business was profitable, a shortage of capital led AOV to sell a 50% interest in the company to one of its major creditors, H.C. Sleigh Netherlands (“Sleigh”), in 1981. By the middle of 1981, Sleigh had made a series of changes that gave it a dominant role in managing AOV.
In the course of acquiring its interest in AOV, Sleigh was occasionally represented by White & Case. The nature and timing of this representation is a matter of controversy, but it is undisputed that the law firm performed three tasks for Sleigh. First, W & C prepared and filed the required “Hart-Scott-Rodino” premerger notification with the Justice Department and the Federal Trade Commission. See 15 U.S.C. § 18a (1982). W & C claims, and Bruce does not contest, that this task was completed by May 1981. Second, W & C assisted Sleigh’s New York counsel in preparing a filing for the U.S. Department of Commerce, as required by the International Investment Security Act of 1976. See 22 U.S.C. §§ 3101-3108 (1982). This work was completed (with a limited exception not relevant here) by October 1981.
Third, W & C performed a “due diligence” search of AOV’s corporate records. The search itself was conducted on August 17-19, and on September 8-12, 1981. The written report detailing the results of the search was submitted to Sleigh on December 31, 1981.
On November 6,1981, AOV filed a Chapter 11 bankruptcy petition. This petition was filed with the assistance of the law firm of Docter, Docter & Salus (“DD & S”); DD & S was appointed by the bankruptcy court as special bankruptcy counsel to AOV on November 17. Because of the size and complexity of the hoped-for reorganization, AOV also hired White & Case as its *1007 general counsel. AOV paid W & C a $50,-000 retainer on November 6, 1981, and the law firm began work immediately thereafter.
In December, AOV asked the bankruptcy court to formally appoint W & C as general bankruptcy counsel. In its application to the court, W & C disclosed that it had previously represented some of the AOV creditors, including Sleigh, but asserted that none of its work for Sleigh was related to the AOV bankruptcy. The application did not disclose whether Sleigh still owed the law firm money for services rendered. The bankruptcy court entered an order appointing W & C on December 22, 1981.
During the next two years, AOV took the lead in negotiating, drafting, and implementing a successful Disclosure Statement and Reorganization Plan. The Plan was overwhelmingly endorsed by the creditors (but not by Bruce), and was confirmed on review by the district court. In re AOV Industries, 31 B.R. 1005 (D.D.C.1983). Bruce appealed the confirmation to this court. After an order remanding the case for further fact finding, see AOV I, at 1144-45, we dismissed a large part of the appeal as moot. Id. at 1146-50.
While the challenges to the Plan were working their way through the system, W & C, along with the other lawyers and accountants who had contributed to the reorganization, filed requests for compensation with the bankruptcy court. White & Case filed a series of interim fee requests during the course of its representation, and filed a final fee application on October 7, 1983. The total fee requests from all professionals was over $3.3 million; the W & C request totaled nearly $1.7 million. Bruce, the United States Trustee, and the Disbursing Agent objected to the W & C application.
AOV’s new president, Peter Gilchrist, also was concerned about the amount of AOV’s assets that would have to be consumed to satisfy the fee requests. He immediately began negotiations with the requesting parties, asking them to modify their demands. After extensive discussions, W & C agreed to scale down its claim to $1.33 million.
The bankruptcy court held a hearing on all the fee applications on November 30 and December 2, 1983. In an oral ruling the judge determined that White & Case was entitled to $1.275 million in fees, 4.6% less than the negotiated figure and 25% less than the original request. To reach this amount, the bankruptcy judge used the “lodestar” method approved by this court in Copeland v. Marshall, 641 F.2d 880 (D.C.Cir.1980) (en banc). The judge calculated a reasonable hourly rate, then multiplied the rate by the number of hours W & C should have spent on its various tasks. After noting the high quality of the representation and the great complexity of the legal issues presented, the judge then reduced the award slightly because he determined that W & C had billed for roughly 350 hours of duplicative services. Transcript of Judge’s Ruling No. 81-0617, at 26 (Bankr.D.C. Dec. 2, 1983); see also infra Part III.
Bruce appealed to the district court, raising the same claims as he had in the bankruptcy court: (1) White & Case had a conflict of interest in representing AOV; (2) the bankruptcy judge should have appointed an independent examiner to analyze the fee requests; (3) the results obtained for the Debtor did not justify the fees awarded. Finding no merit in these allegations, the district judge affirmed the W & C award in full on September 27,1984. In re AOV Industries, 43 B.R. 468 (D.D.C.1984).
Bruce now challenges the district court’s decision. While this appeal was pending, we had occasion to consider Bruce’s conflict of interest claims in AOV I. There Bruce argued that the conflict so tainted the Plan that, not only should the fee award be eliminated, but also the Plan confirmation should be reversed. The panel rejected the attack on the Plan, but deferred consideration of the effect of the alleged conflict on the award until the arguments could be fully presented in this appeal. AOV I, at 1154.
*1008 II.
The Bankruptcy Code provides that the bankruptcy court may award debtor's counsel “reasonable compensation for actual, necessary services rendered.” 11 U.S.C. § 330(a)(1) (1982). The court in its discretion may also award reimbursement for necessary expenses. Id. § 330(a)(2). The decision on whether and at what level to award fees from the debtor’s estate rests in the first instance with the bankruptcy or district court. The requested fees may be reduced or eliminated on a number of grounds, including a finding that the debtor was billed for unnecessary or duplicative services, or a finding that counsel had a conflict of interest in representing the estate. See, e.g., In re Chou-Chen Chemicals, Inc., 31 B.R. 842 (Bankr.W.D.Ky.1983) (conflict of interest); In re The Liberal Market, Inc., 24 B.R. 653 (Bankr.S.D.Ohio 1982) (duplicative services); In re Sutherland, 14 B.R. 55 (Bankr.Vt.1981) (unnecessary services).
As he did in the bankruptcy and district courts, Bruce argues that the fee award should be reduced or vacated on three grounds. His most serious charge is that White & Case had a conflict of interest that violated the Bankruptcy Code. He also continues to assert that the bankruptcy judge was obligated to appoint an independent examiner to scrutinize the fee applications, and that the benefits of the Plan to the Debtor were so inadequate that the award was unjustified.
A. Conflict of Interest
Bruce has repeatedly claimed that W & C should have been disqualified from representing Sleigh because of the law firm’s conflict of interest. White & Case has steadfastly rejected this contention, saying that Bruce and his counsel “see[ ] conflicts of interest everywhere_ It is like people who see communists under their beds.” See In re AOV, 31 B.R. at 1011. Undaunted, Bruce alleges four types of conflict in this appeal.
Appellant’s first claim can be disposed of quickly. Bruce charges that W & C drafted the terms of the Reorganization Plan to favor Sleigh, its former client, over the other creditors. Although the contours of this argument are ill-defined, Bruce’s evidence of this bias is the so-called “release provision” of the Plan. As discussed in AOV I, the release provision provided that Sleigh and another creditor, Steag Handel GmbH, would contribute $3 million in cash to the Debtor’s estate for the benefit of the unsecured creditors; in return, a creditor who wished to draw down its pro rata share of this fund was required to relinquish any direct claims it had against either Sleigh or Steag. See 792 F.2d at 1142-43. Bruce implies that truly neutral debtor’s counsel would not have allowed Sleigh to escape liability that easily.
We reject Bruce’s invitation to find that the release provision per se proves that W & C acted with divided loyalty. While such an arrangement is relatively novel in reorganization proceedings, there is nothing inherently suspect about the debtor and creditors agreeing to a large influx of capital into the bankrupt estate in exchange for the release of the creditors’ claims against the funders. In AOV I, we said in a slightly different context:
As two courts below agreed, this provision on its face was entirely reasonable. Sleigh and Steag could not have been expected to commit millions of dollars to a reorganization plan and still remain liable to individual creditors for the full amount of their claims.
Id. at 1152.
More importantly, Bruce has failed to introduce evidence that in these specific circumstances the provision was preferential to Sleigh, or that W & C induced creditors to vote against their own interests in approving the Plan. There is nothing to suggest that the creditors who voted for the Plan were misled by W & C as to the effect of the release provision, and no evidence that the law firm had any coercive influence over those creditors who released their claims. The release provision helped bring about a successful reorganization, which was W & C’s primary responsibility *1009 to the Debtor. In short, there is little in either fact or theory to suggest that W & C’s interests were so intertwined with those of Sleigh that the law firm helped draft a biased Plan. Appellant’s vague claims to the contrary are unconvincing.
Bruce’s second claim is no more compelling. A few months after it began representing AOV, W & C received a guarantee from Sleigh: Sleigh stated that it would pay those legal fees and disbursements incurred by W & C to the extent that they were neither paid by the Debtor nor allowed by the bankruptcy judge. Thus the law firm was assured of recovering the full value of its work from either AOV or a party that had interests potentially hostile to those of AOV. The existence and terms of the fee guarantee were disclosed to the creditors and the bankruptcy court when W & .C filed its first application for interim fees on April 15, 1982.
One of the Creditors’ Committees objected, claiming that the guarantee:
creates the appearance of a conflict of interest with the obligations that debtors’ counsel has to. the creditors.... [T]he guaranteef] will inevitably raise questions whether any plan proposed by the debtors is excessively favorable to Sleigh.
Motion of Alla-Ohio Valley Coals Creditors’ Committee for an Order Declaring Invalid the Fee Guarantee given by H.C. Sleigh to Debtors’ Counsel, No. 81-0617, at 2-3 (May 7, 1982). After holding a special hearing, the bankruptcy court declared the guarantee invalid. While the judge found no evidence of any actual conflict of interest or bad faith on the part of W & C, he ruled that the guarantee could not be allowed for the reasons expressed by the Creditors’ Committee. Transcript of Oral Ruling, No. 81-0617, at 7-11 (Bankr.D.D.C. July 9, 1982). See In re Bergdog Productions of Hawaii, 7 B.R. 890 (Bankr.D.Hawaii 1980) (declaring similar fee arrangement-invalid).
Even though the guarantee was invalidated less than three months after it was extended, Bruce continues to assert that its brief existence justifies a fee reduction. To the extent Bruce is claiming that the guarantee had a tangible impact on W & C’s behavior, we reject the argument; the judge nullified the arrangement long before the Plan was drafted, so there is no danger that W & C was tempted to alter the Plan to favor the party that might pay its fees. Bruce’s better argument is that the attempt to obtain a guarantee was part of W & C’s effort to protect its own interests first, even at the risk of creating the appearance of a conflict. See In re Perry, Adams and Lewis Securities, Inc., 5 B.R. 63, 64 (Bankr.W.D.Mo.1980) (“the avoidance of the real appearance of impropriety is of chief concern to a court of bankruptcy”); cf. Model Code of Professional Responsibility Canon 9 (A lawyer should avoid even the appearance of professional impropriety.). While the bankruptcy and district courts were free to consider this point as part of the general equitable background when setting fees, we are aware of no authority for the notion that mere insensitivity to a potential conflict is an independent basis for overturning an award.
Appellant’s third allegation is that W & C’s representation of AOV was grossly ineffective because the law firm could not file suit against its former client, Sleigh, one of AOV’s major creditors. Bruce maintains that there were significant liability claims that should have been brought against Sleigh to recapture asserts for the AOV estate. He says that W & C’s inability to bring these suits demonstrates a conflict of interest that should have barred the law firm from becoming debt- or’s counsel.
Bruce argues that there were at least two suits that AOV should have filed against Sleigh: first, a claim for breach of contract based on Sleigh’s alleged failure to invest additional funds in AOV; second, a claim for the mismanagement of AOV after Sleigh had assumed effective control of the company in October 1981. While these allegations, if true, would raise very serious questions about W & C’s ability to represent the Debtor, we find that appellant’s unsupported charges are insufficient *1010 grounds on which to overturn the district court decision.
Bruce originally claimed that Sleigh failed to honor a contractual obligation to invest $20 million in AOV. In its post-argument memo to this court on the conflict question, however, W & C pointed to specific record evidence to show that the $20 million investment had been made. Post-Hearing Memorandum of Appellee AOV Industries, Inc., No. 83-2021, at 5-7 (Apr. 1, 1985). Bruce responded by admitting that the $20 million had indeed been paid; he then revised his allegation to say that Sleigh failed to honor its obligation to make “best efforts” to contribute an additional $30 million to the Debtor. Bruce cites no significant record evidence, however, to support his revised understanding of Sleigh’s obligations, or to show how Sleigh failed to make the required effort on AOV’s behalf.
There are similar defects in the charge that AOV should have sued Sleigh for mismanagement. Appellant claims that AOV had a fair market value of $50 million the month before it filed for bankruptcy, but only $1.7 million by April 1983. To support this claim, Bruce relies on several documents that purport to establish the company’s value in October 1981. These documents, however, either were offered for matters other than the truth of the figures presented, or were simply introduced by counsel without witness testimony or other foundation to vouch for their accuracy. One document cited frequently by Bruce, for example, is a telex from a Sleigh employee who was also AOV president in October 1981. While this telex supports the $50 million valuation asserted by Bruce, it was specifically offered for reasons other than the truth of the figures it contained. See Transcript of Confirmation Hearing at 74 (June 28, 1983). Despite numerous chances to present evidence of a viable mismanagement claim, Bruce has been unable to show how the bankruptcy court was clearly erroneous in failing to credit these allegations.
With the evidence of claims against Sleigh so under-developed, we cannot conclude that the failure to reduce the fees based on these arguments was an abuse of discretion. Both the bankruptcy judge and the district judge had this evidence before them, and neither found that the evidence justified a further fee reduction. Cf. In re Moore, 36 B.R. 323, 329 (Bankr.M.D.Ga.1984) (noting broad discretion of bankruptcy judge in awarding fees). In addition, counter-evidence supports W & C’s argument that there were no viable suits against Sleigh. There were seven creditors’ committees, four of which had Separate counsel. Each committee had an incentive to monitor Sleigh’s conduct, and each could have filed suit, regardless of AOV’s failure to do so. As far as the record shows, none of the groups raised or pursued the breach of contract or mismanagement issues.
We note, however, that there is evidence from which a judge could have found that AOV should have pursued claims against Sleigh. One of the basic powers and duties of debtor’s counsel is to assist in seeking the return of assets to the debtor’s estate. See 11 U.S.C. § 323(b) (1982) (power of trustee to recapture assets through lawsuits); id. § 1107(a) (giving debtor in possession virtually same powers as the trustee). This task cannot be carried out if counsel is barred from scrutinizing one of the major creditors. We need not decide whether a better-argued case on Bruce’s behalf in the bankruptcy court would have yielded a different result on this issue; we only rule that the evidence presented is insufficient to justify disturbing the judge’s exercise of discretion in holding to the contrary.
Appellant’s final conflict claim raises the most troubling questions. Bruce initially argued that W & C should have been disqualified because of its prior representation of Sleigh. As the case progressed through the district court and then this court, appellant discovered some documents which he says prove that W & C represented AOV while still working for Sleigh. Bruce ar *1011 gues that this dual representation violated Code § 327(c).
Code § 327(a) establishes two related criteria for attorneys who seek to represent debtors in possession: first, a lawyer may not represent an interest adverse to the estate; second, he must be a “disinterested person,” which means, inter alia, he must not have interests “materially adverse” to those of the debtor. See also 11 U.S.C. § 101(13) (1982) (defining “disinterested person”). The Code does not define “adverse interest,” but it does state that debtor counsel’s prior representation of a creditor is unobjectionable in some circumstances. Under the pre-amendment version of § 327(c) (which controls these proceedings):
a person is not disqualified for employment under [Chapter 11] solely because of such person’s employment by or representation of a creditor, but may not, while employed by the trustee, represent, in connection with the case, a creditor.
While this subsection refers to the trustee, it is clear that representation of the debtor while simultaneously representing a creditor in connection with the case also is prohibited. In re Georgetown of Kettering, Ltd., 750 F.2d 536, 540 & n. 7 (6th Cir.1984); see also Stein v. United Artists Corp., 691 F.2d 885, 892 (9th Cir.1982) (debtor in possession has same fiduciary duties as trustee); 11 U.S.C. § 1107(a) (1982).
The district court refused to give any credence to Bruce’s charge of overlapping representation. In confirming the Reorganization Plan, the district judge said:
White & Case maintains that it has not represented Sleigh in any manner since it became counsel to the debtor.... [A]s was true during the course of the preparation of the plan, all aspects of this representation have been fully disclosed.
31 B.R. at 1012 (emphasis added, footnote omitted). When this issue was raised again in the district court during the appeal of the fee award, Bruce introduced evidence of concurrent representation that had come to light in the fee hearings. The district court found that
[t]his evidence consists of White & Case’s admission that its report on its “due diligence” investigation of AOV was not sent to Sleigh until after the bankruptcy filing....
Even though White & Case’s final report was turned over to Sleigh, a creditor of AOV, after AOV had filed for bankruptcy, it was transmitted before White & Case assumed its representation of AOV. ... Since White & Case did not represent Sleigh while employed by AOV, this claim [under § 327(c)] fails.
43 B.R. at 475 (emphasis in original). The facts, however, show that these findings are erroneous.
In its application for appointment as general bankruptcy counsel, W & C stated that it had “in the past” represented Sleigh in certain aspects of the creditor’s acquisition of AOV; but, the law firm said, it “does not and will not represent Sleigh in any matters involved in this proceeding.” Application to Employ Counsel, No. 81-0617, 116 (Dec. 22, 1981). In the fee hearings, however, W & C acknowledged that the due diligence report had been delivered on December 31, 1981, nearly two months after it began representing AOV on November 6, 1981. See Transcript of Hearing on All Pending Applications for Final Compensation, No. 81-0617, at 142 (Bankr.D.C. Nov. 30, 1983). Thus it was not true, as the district court found, that the report was delivered before representation of AOV began. On this basis alone we find that the district court’s decision is clearly erroneous.
After the fee award was confirmed, and while AOV I was under submission, Bruce reported that he had new, documentary evidence of simultaneous representation. These documents, consisting primarily of W & C time sheets, came to light in the course of a lawsuit in the Southern District of New York brought by Sleigh against, among others, Bruce’s son and son-in-law. Sleigh claimed in that suit that the two former AOV officials had made fraudulent *1012 misrepresentations in connection with Sleigh’s acquisition of the Debtor.
The time sheets show that White & Case performed services for and was owed money by Sleigh after it began representing AOV. W & C concedes that the records reflect that the firm did 88.1 hours of work for Sleigh after November 5, and that it was still owed money long after this date. Response of AOV Industries, Inc. to Post-Argument Brief and Memorandum of Hubert R. Bruce, No. 83-2021, at 5 n. 3. (May 17, 1985). It also appears that the firm did a few hours of billable work for Sleigh in early January 1982, after the report was delivered. While the number of hours spent on behalf of Sleigh was not great, it is clear that the district court was wrong when it concluded that W & C “did not represent Sleigh while employed by AOV.” See 43 B.R. at 475.
Nor is it true that White & Case completely disclosed the extent of its representation of Sleigh. A fair reading of the application to employ counsel suggests that any “related” work (see infra) done on behalf of Sleigh had ended by the time the law firm began its work for AOV; a more accurate statement would have reflected that there was at least some ongoing representation related to the AOV acquisition. See Bank.R. 2014(a) (application for employment of counsel must reveal to the extent known “all ... connections [of counsel] with the ... creditors”); see also In re Rogers-Pyatt Shellac Co., 51 F.2d 988 (2d Cir.1931) (discussing duty to disclose). The true scope of the overlapping representation was not revealed at least until Bruce stumbled onto the new documents, and indeed, may not yet be fully revealed. There is also no mention in the application that Sleigh still owed W & C money; the law firm did not reveal that it was still receiving money from one of the creditors while •working on behalf of the Debtor.
White & Case strongly objects to our consideration of the newly discovered evidence. It claims that the time sheets have been taken out of context, and are open to several possible interpretations. The law firm claims that it is inappropriate for this court to rely on these documents given that they were not introduced in evidence before the bankruptcy court, and that the facts supporting them thus were never developed.
We agree that no final decision on the W & C award should be made on the basis of these untested documents; we do not agree, though, that they should be ignored. Bruce did not allege that W & C had a conflict because of the overlapping representation until the fee award was being reviewed by the district court; his excuse is that he had no reason to suspect that the law firm was working for both parties at the same time until a W & C lawyer admitted it during the fee hearings. Bruce then raised the point in district court, thus preserving the issue for appeal. He did not present the W & C time sheets, however, until after the appeal was argued in AOV I.
Normally, of course, we are not required to consider evidence presented for the first time on appeal. Singleton v. Wulff, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). It is within the discretion of the court of appeals, however, to make limited exceptions to this rule when “injustice might otherwise result.” Id. at 121, 96 S.Ct. at 2877 (citation omitted); see Proctor v. State Farm Mutual Automobile Insurance Co., 675 F.2d 308, 326 (D.C.Cir.), cert. denied, 459 U.S. 839, 103 S.Ct. 86, 74 L.Ed.2d 81 (1982). Although we do not condone Bruce’s lax attitude about presenting evidence, there are interests at stake beyond those held by the parties before us. As in most bankruptcy cases, the decision we reach will significantly affect all creditors as well as the Debtor. In light of these third-party interests, the case law has recognized that the bankruptcy court’s discretion may not be cabined by mechanical rules for setting fees. Rather, the bankruptcy court must act as a court of equity, setting a reasonable level of fees based on the particular facts presented. See In re Ranchero Motor Inn, 527 F.2d 1044, 1047 (9th Cir.1975); In re Moore, supra, 36 B.R. *1013 at 329. Because in this case the time sheets go to the heart of the contested issue, it would be inconsistent with this court’s own equitable obligations, and its supervisory role in reviewing other courts in equity, to pretend that they do not exist.
Nevertheless, we agree that it would be unfair to rely on these documents without giving W & C a chance to test their relevance and explain their meaning. See Proctor, 675 F.2d at 326 (before considering new issue on appeal, opposing party should have had an opportunity to dispute the facts). We therefore do not resolve this allegation of a conflict; determining the significance of the new evidence requires factual inquiries, a duty strictly within the province of the district court. Goland v. Central Intelligence Agency, 607 F.2d 339, 370-71 (D.C.Cir.1978); reh’g denied, 607 F.2d 367 (1979), cert. denied, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980). We believe that a remand to the district court, with orders to reconsider the question of overlapping representation, will best serve the interests of justice and fairness to the parties.
White & Case’s second defense is that, even conceding a slight overlap in representation, there was no violation of § 327(c) because the work for Sleigh was not done “in connection with” the AOY bankruptcy. It maintains that the due diligence search and report were only concerned with whether AOV had complied with state corporation law concerning shareholder and board meetings. W & C points out that the acquisition of 50% of AOV was completed before the report was delivered (and before W & C began its work for AOV). Thus, it suggests, it accurately disclosed throughout the reorganization that it was not representing an AOV creditor in matters related to the Chapter 11 proceeding.
Bruce’s evidence of a connection between the due diligence report and the bankruptcy proceedings is characteristically underdeveloped. What little evidence there is, however, indicates a plausible tie-in between the two. Among the chores for which W & C apparently billed Sleigh was “advising [Sleigh] with respect to possible litigation against other parties in connection with the Acquisition.” White & Case Billing Sheet, p. 101,797 (May 6, 1982). It is clear that some of these suits could have an impact on Debtor’s assets and liabilities, a matter of great importance to the bankruptcy proceedings.
Moreover, one of the inherent tasks of a lawyer engaged in a due diligence search is to inform the buyer whether the acquired company accurately represented its financial condition during the negotiations. It is the role of buyer’s counsel to report undisclosed information that might affect the value of the company being acquired. Here, for example, there is a suggestion in the record that W & C was examining the AOV corporate books to check the accuracy of the warranties given to Sleigh by the Debtor in the stock purchase agreement. See Affidavit of Thomas L. Higginson, Jr., White & Case Exhibit 3 in Hearings of Nov. 30 & Dec. 2, 1983, No. 81-0167 ¶4 (Jan. 31,1983) (statement by W & C lawyer indicating that certain AOV records examined in due diligence search showed inconsistencies with warranties given in stock purchase agreement). If this were the case, the law firm would face a dilemma: recommending a course of action in its report to one client (Sleigh) that would have conflicted with the interests of its other client (AOV). See Woods v. City National Bank & Trust, 312 U.S. 262, 268-69, 61 S.Ct. 493, 497, 85 L.Ed. 820 (1941) (attorney should not place himself in a position where he may have to choose between conflicting duties); In re Philadelphia Athletic Club, Inc., 20 B.R. 328, 337 (E.D.Pa.1982) (same). Obviously in these circumstances the due diligence report would be “connected” with the bankruptcy within the meaning of § 327(c).
We are not prepared to conclude with absolute certainty that the due diligence report was in fact work done “in connection with” the bankruptcy proceedings. Given that there was no finding on this point by either the bankruptcy or the district court, however, we are unprepared to *1014 find that as a matter of law, W & C complied with § 327(c). Based on the evidence before us,- we remand this question to the district court for further development.
We emphasize the scope of the inquiry-on remand. The district judge is, of course, free to consider all of the evidence that has been presented in reaching his final decision. Our holding, however, should not be taken as an invitation to Bruce to relitigate all of his conflict of interest claims. As explained above, his other allegations are either without merit or unsubstantiated. These issues are now resolved; the only questions remaining concern the extent of the simultaneous representation, whether this representation violated the Code, and if so whether the W & C award should be reduced.
B. Other Claims
Bruce raises two other main arguments on appeal, neither of which warrants discussion. His claim that an independent examiner should have been appointed to review the fee applications, and his claim that the results of the Plan do not justify the award, were adequately discussed and resolved by the district court. See 43 B.R. at 473-75; see also AOV III, 798 F.2d 491, (D.C.Cir.1986). There is no reason to repeat the reasoning here. We also have considered Bruce’s remaining allegations, and find them similarly without merit.
III.
This case has presented complex and important questions. We pause to note that our resolution of these questions was made unnecessarily difficult by the litigation conduct of Bruce and his counsel. The vagueness of appellant’s allegations and his unwillingness to properly develop his legal claims have forced this court to spend an inordinate amount of time piecing together arguments, rather than resolving the questions presented. The untimely presentation of evidence of conflict — as late as the time of appellate argument — created a most uncomfortable dilemma for this court. We are not equipped to weigh such material, and it is most disorderly to the process. Had the issues in this case been properly presented, the bankruptcy and district courts could have better confronted the conflicts question, perhaps obviating the need for a remand now. So while we send this case back for further proceedings, we extend no kudos to Bruce or his counsel for their efforts.
We also note in passing that since the bankruptcy judge calculated the fee awards in December 1983, the Supreme Court has clarified the law with respect to the proper method of determining the lodestar amount. See, e.g., Pennsylvania v. Delaware Valley Citizens’ Council for Clean Air, — U.S. -, 106 S.Ct. 3088, 92 L.Ed.2d 439, restored to calendar for rear-gument on another issue, — U.S. -, 106 S.Ct. 3331, 92 L.Ed.2d 737 (1986); Blum v. Stenson, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). On remand, we invite the district court to consider what effect, if any, these cases have on the bankruptcy court’s lodestar calculation.
The decision of the district court is vacated, and the case remanded with instructions to reconsider the question of simultaneous representation.

It is so ordered.