**In re LEE WAY HOLDING COMPANY Debtor(s).**

**Bankruptcy No. 2–85–00661.**

United States Bankruptcy Court, S.D. Ohio, E.D.

May 19, 1989.

Roger Pascal, Schiff, Hardin & Waite, Chicago, Ill., Russell A. Kelm, Schwartz, Kelm, Warren & Rubenstein, Columbus, Ohio, for PepsiCo, Inc.

Louis F. Cohen, Cohen, Malad & Hahn, Indianapolis, Ind., for Lee Way Holding Co.

Charles R. Saxbe, Chester, Hoffman, Willcox & Saxbe, Columbus, Ohio, for Cohen, Malad & Hahn.

Frederick M. Luper, Luper, Wolinetz, Sheriff & Neidenthal, Columbus, Ohio, Chapter 11 Trustee and for the Estate.

Donald R. Harris, Jenner & Block, Chicago, Ill., for Chapter 11 Trustee.

Robert J. Sidman, Vorys, Sater, Seymour & Pease, Columbus, Ohio, for Unofficial Creditors' Committee.

## OPINION AND ORDER ON PEPSICO, INC.'S MOTION TO DISQUALIFY COHEN, MALAD & HAHN

DONALD E. CALHOUN, Jr., Bankruptcy Judge.

This matter is before the Court on the motion of PepsiCo, Inc. ("PepsiCo"), a creditor herein, to disqualify the law firm of Cohen, Malad & Hahn (formerly known as Dillon & Cohen, and hereinafter referred to as "CMH"), as co-counsel for the debtor, Lee Way Holding Company ("debtor"). PepsiCo also demands that CMH return all fees paid, and that it be denied future compensation. This matter came on for oral hearing, following which the Court took this matter under advisement pending

the submission of post-hearing briefs. Those briefs have been submitted.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this district. This is a core proceeding arising under 28 U.S.C. § 157(b)(2)(A). *See, also, In re GHR Energy Corp.*, 60 B.R. 52 (Bankr.S.D.Tex.1985). The following opinion and order constitutes findings of fact and conclusions of law.

## I. STATEMENT OF FACTS

On the basis of all the evidence in the record, the Court makes the following findings of fact:

1. The debtor filed its petition for relief under Chapter 11, Title 11 of the United States Code on March 7, 1985. On the same date, the debtor filed an application to appoint attorneys for the debtor, to-wit: Squire, Sanders and Dempsey; Lewis F. Cohen and Gregory F. Hahn of Dillon & Cohen; and A.B. Glickman of Ulmer, Berne, Laronge, Glickman & Curtis ("Ulmer–Berne"). Paragraph five of that application states:

> To the best of your applicant's knowledge, said attorneys represent no other entity in connection with this case, are disinterested persons, and represent or hold no interest adverse to the matters on which they are to be employed.

This application was approved by the Court by order entered April 1, 1985.

2. At the time the debtors' petition in this case was filed, the debtor had an executory contract with a corporation known as Transportation Equipment Services, Inc. ("TES"). TES is in the business of buying and selling used trucking equipment. TES was a client of CMH at the time the debtor filed bankruptcy. In fact, CMH had represented TES for several years prior to representing the debtor.

3. In 1984 Lee Way Motor Freight, predecessor to the debtor, was a wholly-owned subsidiary of PepsiCo. PepsiCo made a decision to sell Lee Way, and its intentions generated the interest of Gerard McIntyre ("McIntyre"). McIntyre was the President of a trucking company known as Commercial Lovelace Motor Freight ("CL"). McIntyre was interested in acquiring Lee Way, and by that acquisition greatly expanding the size and extent of CL's commercial operations.

4. Thereafter, PepsiCo and CL negotiated a sale of Lee Way to CL. The terms of that sale in pertinent part, required CL to pay PepsiCo $8 million in cash, which cash CL was to receive from sales of CL and Lee Way equipment to TES. TES' representatives, Edward Mulcahey ("Mulcahey") and Pete Poston ("Poston"), were involved in the negotiations with respect to CL's acquisition of Lee Way.

5. After CL acquired Lee Way from PepsiCo, McIntyre and Mulcahey negotiated additional sales from CL to TES, including a final $3.2 million sale, now known as the executory contract.

6. The executory contract was negotiated in late 1984 and early 1985, and was memorialized by agreement entered into between CL and TES on February 27, 1985.

7. Lewis F. Cohen's ("Cohen") time records show that he billed to his client TES 5.25 hours over the period January 29–30, 1985 for meetings with Poston and Mulcahey with respect to their interest in CL.

8. Gregory Hahn ("Hahn"), an attorney employed with CMH, is designated as the incorporator and registered agent for TES in a section of the annual report of TES filed with the Indiana Secretary of State for 1985. Hahn holds general powers of attorney for TES, which powers have never been revoked. Hahn identifies himself in that annual report as an incorporator, officer and director.

9. Subsequent to the merger of CL and Lee Way, CL/Lee Way found itself in financial distress. McIntyre asked Mulcahey to recommend a good bankruptcy attorney. Mulcahey referred McIntyre to CMH.

10. McIntyre met with Cohen on January 31, 1985 with respect to CMH's representation of Lee Way. Mulcahey and Poston were also present at this meeting as

they had other business to discuss with CMH.

11. At the meeting held January 31, 1985, Cohen advised McIntyre that CMH had an attorney-client relationship with TES, and requested that TES and CL/Lee Way's unfinished business relating to the transfer of truck titles under the executory contract be completed before engaging in the representation of the debtor.

12. At the conclusion of January 31, 1985 meeting, Cohen and McIntyre met privately and reviewed CL/Lee Way's financial situation. Cohen advised McIntyre that if retained by CL/Lee Way, his firm would not represent TES in any of its dealings with CL/Lee Way. Mulcahey and Poston were also subsequently advised of and agreed to this stipulation.

13. On February 5, 1985, Hahn and Eric Redman ("Redman") of CMH met with William Buckham who was the Vice President and General Counsel for CL, and other members of CL/Lee Way management. They discussed CMH's past and ongoing relationship with TES and confirmed that CMH would not represent TES in any dealings with CL/Lee Way.

14. During the remainder of February, 1985, several meetings were held between representatives of CL/Lee Way, and its legal counsel, and creditors and lenders in an effort to keep the company operating.

15. One important party with whom CL/Lee Way's representatives met was TreFoil Corporation ("TreFoil"). As stated, McIntyre and Mulcahey had negotiated for the sale of $3.2 million of Lee Way equipment to TES. TreFoil was agreeable to continuing to extend CL/Lee Way the capital it needed in order to operate on the basis of this agreement.

16. Prior to the filing of the Chapter 11 petition in this Court by the debtor, CL's board of directors voted to merge CL with Lee Way to form the Lee Way Holding Company, the debtor herein, in order to facilitate the administration of the bankruptcy estate. The board also decided to memorialize the $3.2 million sales agreement between CL/Lee Way and TES, since the performance of that agreement was incomplete. Accordingly, the executory contract memorializing that sale agreement was drafted and signed February 27, 1985.

17. The petition for Chapter 11 protection was prepared at the Squire, Sanders & Dempsey law office in Columbus, Ohio by Cohen and Redman. They also prepared a motion to employ attorneys, which motion was signed by McIntyre. These documents were examined and approved prior to filing by Buckham.

18. Following the filing of the Chapter 11 petition, a meeting was held between Cohen and the Unofficial Creditors' Committee ("Committee") on March 21, 1985. At that meeting, Cohen discussed, among other things, the terms of the executory contract, and explained CMH's past and ongoing relationship with TES. He advised those present at that meeting that CMH would not represent TES in any dealings with the debtor. No objection was raised to Cohen's representation of the debtor at that time.

19. The executory contract memorializing the $3.2 million dollar sale agreement was reviewed, amended, and approved by the Committee. On May 3, 1985, the Court approved the executory contract without objection from any party.

20. The executory contract was a major topic of discussion at the March 21, 1985 meeting of creditors. Robert Sidman, attorney for the Committee, testified that:

My recollection of the conversations regarding TES at the meeting of March 21 were that there was a pending executory contract involving TES and the debtor. And there had to be a decision made by the debtor and the Committee as to whether or not that contract should or should not be accepted in the bankruptcy ... That was a fairly urgent item of business because it was a significant contract. It was something that had to be done fairly quickly in the bankruptcy.

21. Testimony as to who actually prepared the executory contract is conflicting. A.B. Glickman, co-counsel to the debtor, testified that he believed the executory contract was prepared by CMH. Cohen, Hahn

and Redman of CMH testified that they had no recollection of either drafting or delivering a proposed executory contract to Glickman. Mulcahey and Poston testified that they did not know who created the original draft of the executory contract. McIntyre testified that he believed it had been prepared by Buckham. Regardless of who actually drafted or delivered the executory contract, it is clear from the record that CMH represented TES in the negotiations of the terms of that contract.

22. The Committee and the debtor, after negotiation, made three changes to the executory contract prior to submitting it to the Court for approval. These changes include:

(1) Permitting the purchaser (TES) to receive the trucks without removing the gas in the tanks;

(2) Extending the performance date to August 1, 1985 in order to fulfill the original intention of the contract to allow ninety days for performance;

(3) Providing additional security for the debtor by obtaining a lien on all titles transferred to TES pending final payment.

23. Following the filing of bankruptcy, the debtor engaged in the development and implementation of a plan of reorganization. Redman and Cohen were involved in the formulation of proposals for a plan of reorganization, as was TES as it was apparently the only entity with the requisite interest and ability to effect a plan of reorganization.

24. The debtor was unsuccessful in developing a feasible plan of reorganization, and on October 24, 1985 the debtor's operations ceased. Following the termination of the debtor's operations, TES expressed an interest in acquiring the assets of the debtor, and submitted proposals to purchase those assets to the Committee. TES withdrew that offer on November 6, 1985.

25. At the meeting of creditors held March 21, 1985, as a result of Cohen's disclosure of his past and ongoing relationship, and specifically of the executory contract, Sidman and the Committee closely scrutinized that transaction. Sidman testified that:

It was discussed, and I don't know who first brought it up, that the Cohen firm was involved in either negotiating or drafting that particular contract probably for TES, and that because of that the Committee ought to scrutinize it very closely.

26. In early September of 1985, about six months after Lee Way filed for protection under Chapter 11, Hahn was asked by Mulcahey to convey to another trucking company, known as Suburban Motor Freight ("Suburban") a letter of intent on behalf of TES to purchase Suburban's operations. Hahn communicated with a Mr. LeGrande ("LeGrande") and Mulcahey on three separate occasions concerning the letter of intent. CMH's firm was involved in the preparation of this letter. Gene Langford ("Langford") was TES's primary counsel in the negotiations for the sale of the Suburban operations to TES.

27. At some point in time, the proposed purchase by TES of Suburban's operations became an element in a plan of reorganization being developed by the debtor in this case. When it became known that Suburban might be an element in this debtor's plan of reorganization, CMH ceased to perform any services for TES related to TES' transactions with Suburban.

28. In February of 1985, Mulcahey of TES personally loaned $65,000.00 to CL Investors, a group consisting of CL executives who had purchased CL stock in 1984. The purchase had been partially financed by Bank One of Columbus, N.A. ("Bank One"). When the bank loan came due in early 1985, McIntyre, a partner in CL Investors, asked Mulcahey for financial assistance. Mulcahey transmitted the funds to McIntyre by means of a wire transfer to Hahn's client trust account in early February of 1985. Hahn then delivered a check to McIntyre when they met in Columbus a few days later. McIntyre executed a promissory note, evidencing the obligation of CL Investors and paid the check to Bank One on February 20, 1985. Mulcahey testified that he personally prepared the note.

29. Shortly after PepsiCo sold Lee Way to CL, an action was brought against CL in Oklahoma styled as *Uselton v. Commercial Lovelace Motor Freight, Inc.*, Case No. CIV–84–2807–W (W.D.Okla.1984). Lee Way and its officers were represented by the Ulmer–Berne firm and by the firm of Pierce, Couch, Hendrickson, Johnston and Baysinger located in Oklahoma. When TES was made a party to the lawsuit, Cohen assisted it in the retention of attorneys James Waldo and Max Tuepker in Oklahoma City as TES's counsel. TES was dismissed from the action in 1986, and all proceedings in that case against Lee Way have been automatically stayed.

30. In 1985, the state of Oklahoma brought an action against TES, styled *State of Oklahoma v. Transportation Equipment Services, Inc.*, Case No. CJ–85–2716 (Dist.Ct.Okla.County, Okla.1985), to recover from TES taxes that the state of Oklahoma claimed were due on TES equipment located in Oklahoma, some of which had been acquired from CL/Lee Way. TES was represented in this proceeding by Max Tuepker. Hahn assisted Tuepker in negotiations with Oklahoma officials which ultimately resulted in the suit's dismissal. The matter is now an administrative claim pending before the Oklahoma State Tax Commission.

31. In the action brought by the state of Oklahoma against TES, CMH learned, during the discussion with Oklahoma officials concerning the alleged TES tax liability, that Oklahoma was contemplating action against the debtor. However, the state of Oklahoma has not to date brought an action against the debtor for any alleged tax liabilities.

32. In 1985, an action was brought in the state of Indiana, styled as *Gierhart v. Transportation Equipment Services, Inc.*, Case No. S685–1419, Marion County (Ind. Super.Ct.1985). In that action, the plaintiff sued both TES and Lee Way for an alleged breach of a lease agreement. Hahn represented both TES and Lee Way in that action. Hahn filed an appearance on behalf of both TES and Lee Way, and filed a motion for change of venue on behalf of both defendants in order to avoid a default judgment and to seek a more favorable forum. In August of 1985, CMH withdrew as counsel for the defendants.

33. In November of 1985, CMH was instrumental in obtaining an emergency temporary transfer of Lee Way's operating authorities to Suburban Motor Freight ("Suburban"). The emergency motion was made only after discussions and agreement among Lee Way's management, its PUCO counsel, counsel for Lee Way, and counsel for the Committee. The principal concern to all parties involved in that transaction resulting in the transfer of Lee Way's operating authorities was that those authorities not be forfeited for non-use. The operating authorities were not lost, and were later sold as an asset of the estate.

34. CMH did not formally disclose to the Court its prior and continuous representation of TES at the time it submitted an application to the Court for employment.

## II. DISCUSSION OF LAW

The standard for employment of professionals in bankruptcy proceedings is governed by 11 U.S.C. § 327(a), which states:

Except as otherwise provided in this section, the trustee [debtor-in-possession], with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C. § 327(c) adds:

In a case under Chapter 7, 12 or 11 of this title, a person is not disqualified for employment under this section solely because of such persons's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest.

Thus, under 11 U.S.C. § 327(c), "a professional is not disqualified for employment

solely because of the person's prior employment by or representation of a secured or unsecured creditor." S.Rep. No. 95–989, 2d Sess. 38 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5824. However, if that professional is employed by the trustee, or debtor-in-possession, he may no longer represent that creditor in connection with the case. 124 Cong.Rec. H11091 (daily ed. September 28, 1978); S17408 (daily ed. October 6, 1978). In the case of *In re AOV Industries, Inc.*, 797 F.2d 1004, 1011 (D.C.Cir.1986), the Court of Appeals for the District of Columbia held that 11 U.S.C. § 327(c) prohibits the "representation of the debtor while simultaneously representing a creditor in connection with the case," citing in support the decision of the Sixth Circuit Court of Appeals in the case of *In re Georgetown of Kettering, Ltd.*, 750 F.2d 536, 540 and n. 7 (6th Cir.1984).

The court in *AOV Industries, Inc.* also stated at page 1011 that 11 U.S.C. § 327(a) establishes two requirements for employment of professionals by a debtor:

> [F]irst, a lawyer may not represent an interest adverse to the estate; second, he must be a "disinterested person," which means *inter alia,* he must not have interests "materially adverse" to those of the debtor.

■ The determination of an interest adverse to the estate must be made before the order appointing and approving counsel is entered. *In re H.L. Stratton, Inc.*, 51 F.2d 984, 987 (2d Cir.1931), *cert. den.* 284 U.S. 682, 52 S.Ct. 199, 76 L.Ed. 576 (1931). It is the duty of the applicant to reveal all connections with the debtor, its creditors, and other parties-in-interest in the application for appointment. Bankruptcy Rule 2014; *In re Hadleman Pipe & Supply Company*, 417 F.2d 1302, 1304 (9th Cir. 1969); and *In re D.H. Overmeyer Telecasting Co., Inc.*, 29 B.R. 647, 750 (Bankr.N.D. Ohio 1983). Indeed, if the disclosures are not made at the time the application for appointment is filed, the Court will be unable to determine whether an adverse interest exists. *Hadleman Pipe & Supply Company* at 1304.

■ An adverse interest exists if the applicant is not a disinterested person. The term disinterested person is defined under 11 U.S.C. § 101(13) in pertinent part as follows:

> In this title—
>
> (13) "distinterested person" means person that—
>
> > (A) is not a creditor, an equity security holder, or an insider; ...
> >
> > (D) is not and was not, within two years before the date of the filing of the petition, a director, officer, or employee of the debtor ...
> >
> > (E) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity ecurity holders, by reason of any direct or indirect relationship to, connection with, or itnerest in, the debtor ...

Bankruptcy Rule 2014 implements 11 U.S.C.·§ 327(c), and states that:

> An order approving the employment of attorneys, accountants, appraisers, auctioneers, agents, or other professionals pursuant to § 327 or § 1103 of the Code shall be made only on application of the trustee or committee, stating the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, *and, to the best of the applicant's knowledge, all of the persons's connections with the debtor, creditors, or any other party in interest, their respective attorneys and accountants.* The application shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, or any other party in interest, their respective attorneys and accountants. [Emphasis added.]

Bankruptcy Rule 2014 requires the professional seeking appointment to disclose in his application to the Court all actual or potential conflicts which may bear upon his eligibility to serve as counsel for the debtor. *In re Roberts*, 75 B.R. 402, 410 (Bankr. D.Utah 1987); *In re Thompson*, 54 B.R.

311, 315 (Bankr.N.D.Ohio 1985), *affirmed,* 77 B.R. 113 (N.D.Ohio 1987). This requirement of full disclosure arises from the fiduciary obligation that an attorney ultimately employed in a bankruptcy proceeding owes to the Court. *Thompson* 54 B.R. at 315; *Matter of Roger J. Au and Son, Inc.,* 71 B.R. 238, 241 (N.D.Ohio 1986). The court in *Thompson* has observed at page 315 that:

> The famous words of Judge Cardozo best describe this fiduciary duty: "Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." *Meinhard v. Salmon,* 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928).

Relevant also to a determination of the issues before us are the provisions of the Ohio Code of Professional Responsibility. Disciplinary Rule 5–105 of Canon 5 states:

> (A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment on behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5–105(C).
>
> (B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5–105(C).
>
> (C) In the situations covered by DR 5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full dislcosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.
>
> (D) If a lawyer is required to decline employment or to withdraw from employment under DR 5–105, no partner or associate of his or his firm may accept or continue such employment.

In the case of *Columbus Bar Assn. v. Grelle,* 14 Ohio St.2d 208, 212, 237 N.E.2d 298 (1968), the Ohio Supreme Court observed that:

> [O]nly in the clearest cases should counsel hazard to represent interests which are or may become adverse, even after disclosing his dual representation. [Emphasis added].

Addressing first the issue of whether CMH had an actual conflict of interest under 11 U.S.C. § 327(c), the Court finds significant the fact that the executory contract, though valid, was unperformed at the time the debtor filed its petition. Although the contract itself had been executed and memorialized, performance under the contract was not set to begin until August 1, 1985, and its performance was subject to approval by the Court. In the case of *In re Midwest Polychem, Ltd.,* 61 B.R. 559, 561 (Bankr.N.D.Ill.1986), the court noted that Professor Countryman defines an executory contract as:

> [A] contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other. Countryman, *Executory Contracts in Bankruptcy: Part I,* 57 Minn. L.Rev. 439, 460 (1973).

CMH argues that performance under the contract was complete upon transfer of the truck titles, but if this were so, the contract would not be executory. Therefore, if the contract was not executory, the Creditors Committee would have had no basis to negotiate additional changes to the contract, and the contract would not have had to be submitted to the Court for approval under 11 U.S.C. § 365, which is to say that the contract was unperformed as of the date of the filing of the debtor's petition and therefore required approval by the Court. *In re A.H. Robins Company, Inc.,* 68 B.R. 705, 707 & 709 (Bankr.E.D.Va.1986).

Moreover, the Court cannot find that the three changes made to the contract were insignificant. The Bankruptcy Code does not define the term "executory contract", yet the legislative history to 11 U.S.C. § 365 reveals that the intent of Congress was to construe executory contracts as those "on which performance remains due

to some extent on both sides." HR Rep. No. 95–595, 95th Cong., 1st Sess. 347 (1977), Reprinted in U.S.Code Cong. & Admin.News, 1978, pp. 5787, 6303.

At the time of the debtor's petition, not only did performance remain due to some extent, but the contract obligations were so far from being performed that the failure of the contracting parties to fulfill their respective obligations would have constituted a material breach. Of the three unperformed obligations, least significant was the condition that the fuel tanks not be drained prior to their delivery to TES. Of more significance were the conditions extending the performance date to fulfill the original intention of the contract, that intention being to allow ninety days for performance, and that the debtor would retain a lien on all truck titles transferred to TES pending final payment. These latter two conditions were material to the performance of the contract, so that their breach would have given rise to a cause of action against the breaching party, and/or could have constituted grounds to excuse the nonbreaching party from performance.

CMH contends that it did not prepare the executory contract, but the facts and evidence in the record suggest that even if it were true that the contract was not prepared by CMH, it is clear that CMH was instrumental in negotiating the terms of that contract and in completing certain transactions on TES' behalf relative to the sale of the equipment. In fact, Cohen advised McIntyre that before CMH could represent the debtor, he would have to complete unfinished business regarding the transfer of truck titles with respect to that sale.

Yet, at the time the petition was filed, the business relating to those truck titles was not finished. Also, additional terms of that contract remained subject to negotiation. At that point, CMH was representing the debtor in negotiating additional terms to a contract that it had been involved with while representing TES, a major creditor of the debtor. Without question, the interests of TES, as purchaser, and the debtor, as seller, were adverse. If the sale was *bona*

*fide*, as CMH states that it was, then the Court can infer that TES would have been motivated to seek a purchase of the equipment at the lowest price possible under terms most favorable to it. The debtor would have been seeking the opposite. CMH, therefore, at different points in the transactions and negotiations resulting in the sale was representing the conflicting interests of TES and the debtor. The Court is not required to speculate as to what may have resulted from this conflict, nor accept as an excuse that the result was not detrimental to the estate. As observed by the U.S. Supreme Court:

> [T]he incidence of a particular conflict of interest can seldom be measured with any degree of certainty. The bankruptcy court need not speculate as to whether the result of the conflict was to delay action where speed was essential, to close the record of past transactions where publicity and investigation were needed, to compromise claims by inattention where vigilant assertion was necessary, or otherwise to dilute the undivided loyalty owed to those whom the claimant purported to represent. Where an actual conflict of interest exists, no more need be shown in this type of case to support a denial of compensation.

*Woods v. City National Bank & Trust,* 312 U.S. 262, 269, 61 S.Ct. 493, 497, 85 L.Ed. 820 (1941).

Whether the sale under the executory contract benefitted the estate is a question that the Court cannot consider as relevant to a determination of whether CMH had an actual conflict in this case. The sale transpired nearly four years ago, and was approved by this Court absent the knowledge of CMH's representation of both TES and the debtor in that transaction. The merits of that sale cannot now be inquired into by the Court because the opportunity for a determination as to the effect of CMH's role in the sale has been lost. The Court finds that the representation by CMH of TES with respect to the sale prepetition, and its representation of the debtor with respect to the same sale postpetition was in conflict, which conflict was actual, and which conflict should have, and if known to

the Court, would have precluded CMH's employment in these proceedings.

Moreover, the Court finds that CMH's postpetition representation of TES, purportedly in matters unrelated to this proceeding, to have been in violation of the proscriptions of 11 U.S.C. § 327(c). CMH's representation of TES in the state court litigation in Oklahoma, Indiana, and in this Court, which litigation involved the debtor, was in violation of 11 U.S.C. § 327(c). As noted, "a professional is not disqualified for employment solely because of the person's prior employment by or representation of a secured or unsecured creditor." S.Rep. No. 95–989, 2d Sess. 38 (1978), U.S. Code Cong. & Admin.News 1978, p. 5824. However, if that professional is employed by the debtor, he may no longer represent that creditor *in connection* with the case. 124 Cong.Rec. H11091 (daily ed. September 28, 1978); S17408 (daily ed. October 6, 1978); *AOV Industries*, 797 F.2d at 1011. The simultaneous representation of a creditor in connection with this case, therefore, is prohibited under 11 U.S.C. § 327(c). *In re Georgetown of Kettering, Ltd.*, 750 F.2d 536, 540 & n. 7 (6th Cir.1984). Those proceedings were pending at the time this Chapter 11 petition was filed, and at least two of those proceedings, involved both TES and the debtor. In the Indiana state court action, CMH represented both the debtor and TES, that is until it withdrew as counsel in that case in 1985. The representation by CMH of TES in the state court litigation, when the outcome of those cases could affect the nature and extent of the debtor's liabilities, either upon liquidation of those claims in state court upon lifting of the automatic stay if such relief were afforded, or by adjudication of those claims in this Court, was connected to this proceeding, and therefore in violation of 11 U.S.C. § 327(c).

The second part of the Court's analysis of the issues, presented in this matter focus on whether CMH's employment can be upheld under the standards found in 11 U.S.C. § 327(a). To be qualified to represent the debtor, CMH must "not hold or represent an interest adverse to the estate" and must be a "disinterested person." 11

U.S.C. § 327(a). As observed by the court in *Roger J. Au & Son, Inc.*, 64 B.R. 600, 604 (Bankr.N.D.Ohio 1986) both parts of the test established under 11 U.S.C. § 327(a) are met when it is shown that counsel is not a disinterested person, because the Code defines disinterested person as one who:

> [D]oes not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor or an investment banker specified in subparagraph (B) or (C) of this paragraph, or for any other reason.

11 U.S.C. § 101(13)(E).

The standards of disinterestedness and absence of adverse interest "are intended to address not only actual and potential conflicts, but also the appearance of impropriety or conflict irrespective of the integrity of the person or firm under consideration." *In re Watson*, 94 B.R. 111, 116 (Bankr.S.D.Ohio 1988). As Judge R. Guy Cole of this district observed in *Watson* at 116:

> A disinterested person should be divested of any scintilla of personal interest which might be reflected in the attorney's decision concerning estate matters. [Citations omitted].

Judge Cole went on to observe in *Watson* at 117:

> The courts are absolutely uniform as to one command: the bankruptcy court must—no matter how unpleasant a task it may be—ensure the integrity of the bankruptcy process. The interests of maintaining public confidence in the bankruptcy system must prevail. *See, Kraft, Inc. v. Alton Box Board Co.*, 659 F.2d 1341, 1348–49 (5th Cir.1981); *Matter of Cropper*, 35 B.R. 625, 632 (M.D. Ga.1983).

▮ The Court cannot conclude that CMH was disinterested under 11 U.S.C. § 327(a). CMH, as noted, was instrumental in the transactions relative to the sale of the equipment by the debtor prepetition,

and yet negotiated on the debtor's behalf additional terms with respect to that sale postpetition. Moreover, at the time these negotiations were taking place, Gregory Hahn, an attorney employed with CMH, held general powers of attorney for TES, and was an incorporator, director, and officer of TES, which relationship posed a direct conflict to the interests of the debtor, while also giving the appearance of impropriety. *Roger J. Au & Son,* 64 B.R. at 605. CMH was not removed of "any scintilla of personal interest" with respect to the negotiations and decisions concerning the terms of the executory contract. *Watson* at 116. TES is a significant creditor of the debtor. TES was the purchaser of equipment owned by the debtor. The interests of TES and the debtor were materially adverse during the negotiations for the sale, and remain materially adverse with respect to TES' claims in this case. CMH's past and present relationship with TES was not so removed at the time it engaged in the representation of the debtor so as to eliminate the appearance of impropriety or potential for conflict.

Also troubling was CMH's transfer of the $65,000.00 loan from Mulcahey to CL investors. Hahn of CMH testified he did not know the true nature of the loan was to allow CL investors to pay down the Bank One loan. Hahn did, however, testify that he thought the money was for the purchase of trucks by TES from CL, and if this were true, then certainly the appearance of impropriety and potential for conflict was raised by CMH acting as a conduit for a $65,000.00 transfer from TES to CL/LeeWay in February of 1985, especially after CMH in January of 1985 had represented to officials of TES and of CL/Lee Way that it would not represent TES in matters related to this proceeding. The Court is of the opinion that while the record does not support a finding that the $65,000.00 transfer created an actual conflict under 11 U.S.C. § 327(c), it without question created the appearance of impropriety and potential for conflict under 11 U.S.C. § 327(a).

The Court is of the opinion that not only was CMH's representation of TES and the debtor improper and in conflict of interest under the Bankruptcy Code, but it was also in violation of Ohio's Code of Professional Responsibility. ("CPR"). Canon 5 of the CPR states:

A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client.

Ohio Rev.Code Ann. title 19, Canon 5 (1983).

Disciplinary Rule 5–105(A) requires that an attorney refuse proffered employment if that employment will, or is likely to, adversely affect the exercise of his independent professional judgment. Ohio Rev. Code Ann. tit. 19, DR5–105(A) (1983). Disciplinary Rule 5–105(B) adds that a lawyer cannot continue in the representation of multiple clients if such employment will, or is likely to, adversely affect the exercise of his independent judgment. Ohio Rev.Code Ann. tit. 19, DR 5–105(B) (1983). Disciplinary Rule 5–105(C) permits multiple representation of clients, however, if: (1) it is obvious that the attorney can adequately represent the interests of each of those clients, and (2) only after "full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each." Ohio Rev.Code Ann. tit. 19, DR5–105(C) (1983).

Ohio's CPR is applicable to all attorneys admitted to practice in the State of Ohio and appearing in the Federal Courts established in Ohio by virtue of the Model Federal Rules of Disciplinary Enforcement, adopted in this District by General Order 81–1 entered September 1, 1981. Rule IV(B) of the Model Federal Rules of Disciplinary Enforcement states:

B. Acts or omissions by an attorney admitted to practice before this Court, individually or in concert with any other person or persons, which violate the Code of Professional Responsibility adopted by this Court shall constitute misconduct and shall be grounds for discipline, whether or not the act or omission occurred in the course of an attorney-client relationship. *The Code of Professional Responsibility adopted by this Court is the Code of Professional Responsibility adopted by the highest court of the state*

*in which this Court sits, as amended from time to time by that state court, except as otherwise provided by specific rule of this Court after consideration of comments by representatives of bar associations within the state.* [Emphasis added.]

The interests of TES and the debtor, as previously set forth, were of a degree of adversity that CMH should have declined employment by the debtor under DR 5-105(A). There is no doubt that the conflicting interests of the debtor and TES could affect the exercise of CMH's independent professional judgment. The conflict was such that it was, or could become, adverse, and in recognition of the potential for conflict, CMH should have refused to accept employment on behalf of the debtor. *Grelle* 14 Ohio St.2d at 212, 237 N.E.2d 298.

Moreover, the Court cannot conclude that CMH met the standards under DR5-105(B) and (C) to permit its continued representation of the debtor. First, the representation of TES prepetition with respect to the executory contract, and of the debtor postpetition with respect to the same contract, was likely to adversely affect the exercise of CMH's professional judgment with respect to the terms and execution of that contract. Second, under DR5-105(C) the Court is unable to say that it was obvious, given the status of TES and of the debtor, that CMH could adequately represent the interests of both. Third, although CMH disclosed to the debtor its prior representation of TES, there is nothing in the record to indicate that CMH disclosed the possible effect of its representation of the debtor on the exercise of CMH's independent judgment with respect to the negotiation of the executory contract. Likewise, CMH did not disclose the possible effect of its representation of the debtor on the exercise of CMH's independent judgment with respect to CMH's continued legal representation of TES postpetition, whether or not related to these proceedings. The conflict apparent in the relationship of TES and the debtor was obvious, and should have precluded CMH's representation of the debtor in this case. The Court finds that CMH violated DR5-105 of the CPR by representing the interests of both the debtor and TES.

There can be no doubt that had CMH disclosed its past and continuing relationship with TES at the time it sought appointment from the Court as a professional in this case, that disclosure would have prompted the Court to inquire into the nature of that relationship. If upon inquiry, the Court discovered the facts of that relationship to be as it is now known, the Court would not have approved CMH's employment. Yet, CMH's relationship with TES was not disclosed to the Court in CMH's application as required under Bankruptcy Rule 2014. In an apparent attempt to convince the Court that it complied with the intent and purpose of Rule 2014, CMH states that it revealed its relationship with TES to the Creditors' Committee, and that the Committee did not object or otherwise voice objection to CMH's employment by the debtor. The strictures of Rule 2014 are not met by disclosure to the Committee. The Committee does not approve applications for appointment of professionals under 11 U.S.C. § 327. It is the duty of the professional seeking employment under 11 U.S.C. § 327 to disclose by a verified statement his "connections with the debtor, creditors, or any other party in interest, their respective attorneys and accountants." Bank.R. 2014; *In re Thompson*, 54 B.R. 311, 315 (Bankr.N.D.Ohio 1985), *affirmed*, 77 B.R. 113 (N.D.Ohio 1987). Indeed, the disclosure requirements imposed under Rule 2014 and 11 U.S.C. § 327 require complete disclosure by the professional seeking employment of all facts impacting upon his eligibility for appointment. *Thompson*, 54 B.R. at 315.

The application seeking CMH's appointment as attorneys for the debtor fails to disclose to any extent its connections with TES. That application, at paragraph 5, states:

To the best of your applicant's knowledge, said attorneys represent no other entity in connection with this case, are disinterested persons, and represent or

hold no interest adverse to the matters on which they are to be employed.

The Court finds it inconceivable that CMH could have made such an assertion to the best of its knowledge, while knowing that it had represented TES with respect to the executory contract, knowing that a member of its law firm was an incorporator, officer and director of TES, and knowing that it intended to continue to represent TES, whether or not in matters unrelated to this bankruptcy. The Court finds that the application seeking to employ CMH as attorneys for the debtor failed to adequately disclose to the Court CMH's connections with the debtor and with TES, and therefore should not have been approved.

CMH was not qualified for employment under the standards established by 11 U.S.C. § 327, DR5–105, and Bankruptcy Rule 2014. The Court is of the opinion that CMH's failure to disclose its relationship with TES at the time it sought appointment by this Court as counsel for the debtor, and its continuing relationship with TES after appointment, requires no less than its disqualification. This Court must be ever mindful that the stringent requirements and standards for employment of professionals under the Bankruptcy Code and Rules are designed to insure the integrity of the bankruptcy process, and the public confidence in the bankruptcy courts. *Watson*, 94 B.R. at 117; *Roger J. Au & Son*, 64 B.R. at 606. The conduct of CMH in this case seriously undermined the integrity and confidence of the judicial process and therefore requires CMH's disqualification.

The remaining issue to be decided is that branch of PepsiCo's motion seeking disgorgement of all fees awarded and paid to CMH in connection with its representation of the debtor in this case. Without question counsel owes a fiduciary duty of loyalty to the estate. *Thompson*, 54 B.R. at 315; *Roger J. Au and Son*, 71 B.R. at 241. This duty requires the exercise of independent professional judgment, unfettered from compromising influences. *In re Philadelphia Athletic Club, Inc.*, 20 B.R. 328, 334 (D.C.Pa.1982). The professional obligation owed by attorneys to the courts and to the legal system was well observed by the court in *Matter of Arlan's Dept. Stores, Inc.*, 615 F.2d 925 (2d Cir.1979) when it recited the words of the U.S. Supreme Court in case of over one hundred years' vintage. The U.S. Supreme Court expressed that obligation in the following manner:

> They are officers of the law, as well as the agents of those by whom they are employed. Their fidelity is guaranteed by the highest considerations of honor and good faith, and to these is superadded the sanction of an oath. The slightest divergence from rectitude involves the breach of all these obligations. None are more honored or more deserving than those of the brotherhood who, uniting ability with integrity, prove faithful to their trusts and worthy of the confidence reposed in them. Courts of justice can best serve both the public and the profession by applying firmly upon all proper occasions the salutary rules which have been established for their government in doing the business of their clients.

*Arlan's Dept. Stores*, 615 F.2d at 944 (quoting *Baker v. Humphrey*, 101 U.S. 494, 502, 25 L.Ed. 1065 (1879)).

In representing the debtor and TES, CMH breached its fiduciary duty by failing to remove any uncompromising influences that could have impeded the exercise of its professional judgment. Too, by failing to disclose its relationship with TES at the time it sought appointment, CMH breached its fiduciary duty to this Court.

That the Court has the power to order disgorgement of fees awarded to CMH in this case as a result of the breach of its fiduciary duty is without question. 11 U.S.C. § 327; *Woods*, 312 U.S. at 266–268, 61 S.Ct. at 496–497; *Arlan's Dept. Stores*, 615 F.2d 943; *Matter of Chambers*, 76 B.R. 194, 195 (Bankr.M.D.Fla.1987); *Matter of Kero–Sun, Inc.*, 58 B.R. 770, 778 (Bankr.D. Conn.1986); *In re Damon*, 40 B.R. 367, 376 (Bankr.S.D.N.Y.1984). CMH made no effort to disclose its connections with TES at the time it sought appointment by this Court as counsel for the debtor. Furthermore, those connections created the appear-

ance of impropriety, and the potential for conflict. CMH's representation of the debtor with respect to the executory contract, when it had represented TES on the same contract, was in actual conflict of the interests of the debtor and TES. Lastly, CMH's acceptance of employment by the debtor, without adequate disclosure, and with knowledge of its representation of TES, constituted a violation of DR5–105. The seriousness of these breaches mandates disgorgement of all fees awarded and paid to CMH in connection with these proceedings.

### III. CONCLUSION

In summation, on the basis of the foregoing findings of fact and conclusions of law, PepsiCo's motion for disqualification and for disgorgement of fees is GRANTED.

IT IS ORDERED that CMH return to the estate the sum of $209,100.00 as reflected in the record as the amounts awarded as fees by prior orders of this Court. Reimbursement of expenses previously allowed to CMH are specifically excluded from disgorgement.

IT IS SO ORDERED.